**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID THOMPSON, | ) | CASE NO. 1:18CV01195 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, David Thompson ("Plaintiff" or "Thompson"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 *et seq.* ("Act").

This Court has jurisdiction[2] pursuant to 42 U.S.C. § 405(g) and the consent of the parties,

pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is VACATED and REMANDED for further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I.  PROCEDURAL HISTORY

In December 2014, Thompson filed an application for POD and DIB alleging a disability onset date of October 21, 2014 and claiming he was disabled due to degenerative disc disease of the cervical and lumbar spine, pelvis pain, depressive disorder, and diabetes.  (Transcript ("Tr.") at 197, 227.)  The applications were denied initially and upon reconsideration, and Thompson requested a hearing before an administrative law judge ("ALJ").  (Tr. 140, 149, 156.)

On August 31, 2016, an ALJ held a hearing, during which Thompson, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 44.)  On November 28, 2016, the ALJ issued a written decision finding Thompson was not disabled.  (Tr. 7.)  The ALJ's decision became final on November 15, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On May 24, 2018, Thompson filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)  Thompson asserts the following assignments of error:

> (1)  Whether the ALJ failed to properly weigh and evaluate the opinion of Social Security's consulting, examining physician.
>
> (2)  Whether the ALJ's rejection of Plaintiff's need for a cane was in error.

(Doc. No. 14.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Thompson was born in March 1960 and was 55 years-old at the time of his date last insured, making him a "person of advanced age" under social security regulations.  (Tr. 18.)  *See* 20 C.F.R. §§ 404.1563(e).  He has a high school education and is able to communicate in

English.  (*Id.*)  He has past relevant work as a general supervisor, production planner, and mixer operator.  (*Id.*)

## B.     Medical Evidence[3]

### 1.       Mental Impairments

On October 20, 2014, Thompson visited psychiatrist Dietrich Schelzig, M.D., for medication management.  (Tr. 523.)  He reported chronic pain, poor sleep, but denied suicidal ideation.  (Tr. 524.)  During the appointment, Thompson made good eye contact, was cooperative, and his insight was fair.  (*Id.*)  He was walking with a cane and his gait was "pain limited."  (*Id.*)  Dr. Schelzig observed Thompson's judgment was impaired "based on recent neurocognitive testing."  (*Id.*)  The doctor advised Thompson to return in three months for follow up.  (*Id.*)

Thompson visited clinical nurse specialist Janelle Romond, CNS, on October 23, 2014 for a psychiatric consultation.  (Tr. 520.)  He reported back and pelvis injuries stemming from a 2006 motorcycle accident.  (*Id.*)  He described chronic pain, poor sleep, and burning, tingling, and pain in his feet.  (Tr. 520-521.)  Ms. Romond diagnosed insomnia related to chronic pain and referred Thompson for cognitive behavioral therapy.  (Tr. 522.)

On April 13, 2015, Thompson visited clinical psychologist Jacqueline Naeem, Psy.D., for a mental health assessment and therapy.  (Tr. 460.)  Thompson described passive suicidal ideation, poor sleep, and a sharp decline in his mental health since his sister's recent death.  (*Id.*)  He was tearful, but his cognition and thought processes were intact, and his insight and judgment

_____

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is  limited to the evidence cited in the parties' briefs.

were fair.  (Tr. 460, 461.)  Thompson reported that while he had been taking medications for depression since 2013, he was experiencing passive suicidal ideation and episodes of syncope in the past year.  (Tr. 461.)  Dr. Naeem referred Thompson to a suicide prevention coordinator and a chronic pain rehabilitation program.  (Tr. 462.)  Shortly thereafter, the pharmacy from which Thompson obtained his medications identified him as a high risk for suicidal behavior.  (Tr. 323.)

Thompson visited suicide prevention coordinator Elizabeth Biddulph, LISW-S, on April 14, 2015.  (Tr. 325.)  Thompson endorsed recent passive suicidal ideation and he presented with a tearful, limited affect.  (*Id.*)  He ambulated with a cane and his judgment and insight were fair to good.  (*Id.*)  Thompson indicated increased irritability and social isolation.  (Tr. 326, 327.)  He described a recent "sharp increase in frequency and specificity" of suicidal thoughts.  (Tr. 327.)  Ms. Biddulph determined Thompson was a "high suicide risk" and recommended he create a suicide prevention plan and attend weekly counseling.  (Tr. 328.)  Thompson and Ms. Biddulph created a suicide prevention plan on April 16, 2015.  (Tr. 318.)

On April 30, 2015, Thompson returned to Dr. Naeem for therapy.  (Tr. 304.)  He reported a low mood and motivation.  (*Id.*)  He denied suicidal ideation and his insight and judgment were good.  (Tr. 305.)  Thompson saw Dr. Naeem again on May 27, 2015, reporting feelings of failure and shame.  (Tr. 291.)  He denied any suicidal intent or plan and he had good insight and judgment on examination.  (*Id.*)

On June 1, 2015, Thompson reported to Dr. Naeem he had recently submitted an application to Ohioans with Disabilities.  (Tr. 290.)  He described multiple stressors involving his disability application and finances, but reported his grandchildren provided a distraction and

denied suicidal ideation. (*Id.*) Dr. Naeem encouraged Thompson to perform deep breathing at bedtime. (*Id.*) Thompson reported increased depression to Dr. Naeem on September 22, 2015. (Tr. 679.) He denied suicidal ideation. (*Id.*)

On October 13, 2015, Thompson reported "several examples of falls in the last few weeks" to Dr. Naeem. (Tr. 678.) Despite using a walker at home, he continued to stumble when walking from the bed to the bathroom. (*Id.*) Dr. Naeem encouraged him to continue to use his walker. (*Id.*) Thompson also reported sadness over his inability to attend a hunting trip due to his physical limitations. (*Id.*)

Thompson reported frustration over his physical condition to Dr. Naeem on November 5, 2015. (Tr. 677.) He denied suicidal ideation and continued to develop coping skills. (*Id.*) On May 24, 2016, Thompson had a low mood and feelings of hopelessness due to his physical health. (Tr. 652.) He expressed frustration over his inability to perform activities he was once able to do. (*Id.*) Thompson denied suicidal ideation and Dr. Naeem advised him to return in four weeks for continued therapy. (*Id.*)

## 2. Physical Impairments

An August 1, 2013 lumbar MRI spine revealed (1) status post laminectomy of L4 with posterior fusion of L3 and L5; (2) multi-level degenerative disc disease; (3) mild to moderate neuroforaminal narrowing at L3-4; and (4) mild to moderate neuroforaminal narrowing at L4-5, with mild disco-osteophytic bulging. (Tr. 408.)

On August 19, 2014, Thompson underwent a kinesiotherapy driving assessment with kinesiotherapist Anthony Zakrzewski. (Tr. 536.) He reported episodes of syncope and "b[l]acking out." (*Id.*) He indicated he used a wheeled walker and standard cane for ambulation,

5

and during the assessment, he was using a cane.  (Tr. 538.)  On examination, Thompson's balance while seated was good and his balance while standing was fair.  (Tr. 539.)  He was able to ambulate "several hundred to thousand feet without sitting using cane."  (*Id*.)  Mr. Zakrzewski concluded Thompson did well on the screening tests for driving, but he was concerned about Thompson's episodes of "blacking out."  (Tr. 540.)

Thompson underwent a neurology consultation with neurologist Amani Remahi, M.D., on April 1, 2015.  (Tr. 340.)  He described episodes of dizziness and tremor, usually occurring while standing.  (*Id.*)  He reported he had stopped driving due to these episodes.  (*Id.*)  He also reported lower back radiating down both legs.  (*Id.*)  On examination, Thompson had mildly decreased sensation in both feet, used a cane for ambulation, and favored his left leg due to pain.  (*Id*.)  He was able to toe walk on the right, but only minimally on the left due to pain.  (*Id*.)  He could heel and tandem walk, albeit with pain.  (*Id.*)

Dr. Remahi observed Thompson's symptoms did not seem consistent with orthostatic hypotension or vestibular dysfunction.  (*Id.*)  The doctor ordered further testing and a visit to the pain clinic.  (Tr. 341.)  Dr. Remahi also encouraged Thompson to slowly increase his activity level.  (*Id.*)

On April 21, 2015, Thompson underwent an audiology balance evaluation with audiologist Jennifer Kazuka.  (Tr. 445.)  He described episodes of dizziness and shaking, including several episodes in which he lost consciousness and woke up on the floor.  (*Id*.)  During the evaluation, Thompson was ambulating with a cane and reported intermittent tingling in his feet.  (Tr. 446.)  Testing confirmed hearing loss in both ears.  (*Id*.)  Thompson's videonystamography and vestibular sensory integration testing were "indicative of a normal

functioning peripheral vestibular and ocular-motor system." (Tr. 448.) Ms. Kazuka recommended Thompson follow up with his neurologist. (*Id.*)

Thompson underwent a pain management consultation with nurse practitioner Marcia A. Winter, N.P., on April 24, 2015. (Tr. 406.) He reported dizziness, lower back pain radiating into his right buttock/hip, back spasms, and tingling in his feet. (*Id.*) He described his history of treatment, including a back surgery, multiple injections, physical therapy, aquatic therapy, and multiple medication failures. (*Id.*) On examination, Thompson ambulated with a cane, with a slow, antalgic gait. (Tr. 409.) He was able to stand on his toes and heels and his straight leg raise was negative. (*Id.*) The muscles in his back were taut and tender. (*Id.*) Ms. Winter referred Thompson for an injection, physical therapy, and chiropractic treatment. (*Id.*) She prescribed Tramadol and suggested Thompson walk short distances daily. (*Id.*) On April 27, 2015, Thompson underwent a right quadratus laborum trigger point injection. (Tr. 307.)

On May 15, 2015, Thompson returned to Dr. Ramahi, reporting continued tremors. (Tr. 297.) He described them as starting at the "back of the head" and then moving down "his 'whole body' accompanied by dizziness" and shaking. (*Id.*) He indicated these episodes occurred with extended sitting and standing. (*Id.*) On examination, Thompson did not have a resting tremor, but he did have a "very mild postural and action tremor of both hands." (Tr. 298.) He had mildly decreased sensation in both feet and was using a cane for ambulation. (*Id.*) He favored his left leg due to pain and had difficulty with heel and toe walking. (*Id.*) Dr. Ramahi diagnosed systolic orthostatic hypotension in conjunction with elevated diastolic blood pressure and a mild essential tremor. (*Id.*) Thompson was referred to a cardiologist and occupational therapy. (*Id.*)

Thompson visited chiropractor Anthony Battaglia on May 26, 2015. (Tr. 294.) He had a decreased lumbar range of motion, a normal heel/toe walk, reduced cervical range of motion, and hypertonic cervical and upper dorsal musculature. (*Id.*) Chiropractor Battaglia administered several chiropractic treatments. (*Id.*)

On July 19, 2015, Thompson visited the emergency room for a back pain exacerbation after bending over. (Tr. 901.) He presented to the emergency room in a wheelchair. (*Id.*) On examination, he did not ambulate with an assistive device. (Tr. 902.) He had tenderness in his back and a decreased range of motion in his left leg. (Tr. 905.) The emergency room physicians prescribed Norco and steroids and discharged Thompson the same day. (*Id.*)

Thompson underwent a neurological consultation with neurologist Robert Shields, M.D., on October 21, 2015. (Tr. 713.) He described "spells of orthostatic tremors and falls." (*Id.*) He relayed he recovered quickly from these spells and they only occurred while standing. (*Id.*) Thompson reported leg weakness, tingling in his feet and fingers, and an unsteady gait. (Tr. 714.) He indicated he had been using a walker and a cane for the past 3-4 years to "prevent fall[s] from tremor spells." (*Id.*)

On examination, Thompson had normal tone, bulk, and power in his upper extremities. (Tr. 715.) However, in his lower extremities, Thompson's leg tone was increased, the right side more than the left. (*Id.*) He had give way weakness in his hip flexors and the rapid fine movements of his fingers were "performed with mild slowness and irregularity bilaterally." (*Id.*) His sensation was intact. (*Id.*) Gait and station testing revealed "minimal circumduction of the right lower extremity." (Tr. 716.) He was able to support his weight on his heels, and while he could take steps on his heels, he required assistance for balance. (*Id.*) Dr. Shields concluded

Thompson had a possible "underlying dysautonomia" and ordered lab studies for further evaluation. (*Id*.)

Thompson subsequently had heart surgery on April 15, 2016. (Tr. 653.) He continued to report syncopal episodes in the month following this operation. (*Id*.) He also reported tachycardia following the surgery. (Tr. 657.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On February 10, 2015, state agency physician Robyn Hoffman, Ph.D., reviewed Thompson's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 118-119.) She concluded Thompson had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) no difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 118.) Dr. Hoffman also completed a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 122.) She concluded Thompson was moderately limited in his ability to interact appropriately with the general public. (*Id*.) She found Thompson was not significantly limited in his abilities to (1) ask simple questions or request assistance; (2) accept instructions and respond appropriately to criticism from supervisors; (3) get along with coworkers or peer without distracting them or exhibiting behavioral extremes. (*Id*.) Dr. Hoffman found no evidence of limitation in Thompson's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id*.)

On July 14, 2015, state agency physician Courtney Zeune, Psy.D, reviewed Thompson's medical records and completed a PRT and Mental RFC Assessment. (Tr. 131, 134.) She

concluded Thompson had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 131.) She adopted the findings of Dr. Hoffman in her Mental RFC. (Tr. 134.)

### 2. Physical Impairments

On February 28, 2015, Thompson underwent a consultative examination with neurologist Dariush Saghafi, M.D. (Tr. 258-260.) Thompson reported lower back pain since a 2006 motorcycle accident and subsequent surgery. (Tr. 258.) He described burning down the right leg and numbness in his heel. (*Id*.) On examination, he was wearing a corset and had a well-healed scar along his lumbar region. (*Id*.) Tone and bulk were normal on examination and there was no evidence of tremor. (Tr. 259.) He had full strength in his upper and lower extremities, intact sensation, lumbar spine tenderness, and decreased deep tendon reflexes. (Tr. 259-260.) Thompson ambulated with an "antalgic gait without predisposition to falls and he use[d] a cane for safety." (Tr. 260.) His grasp, manipulation, pinch, and fine motor coordination were all abnormal in his right hand, with reduced grasp strength. (Tr. 261.) His cervical spine, shoulder, elbow, and wrist ranges of motion were normal, but his lumbar spine range of motion was painful and reduced. (Tr. 262-263.)

Based upon this examination, Dr. Saghafi reached the following conclusion:

The patient suffers more likely than not from an L5 radiculopathy down the right. He is [status post] surgical resection and reconstruction L4 following severe traumatic injury. He is a poor candidate at this time for heavy lifting/carrying due to the back condition which is not expected to improve at this point. The claimant is able to lift, push, and pull sufficiently to perform [activities of daily living]. The claimant is able to somewhat and bend[sic], walk/stand for about 20 minutes before having to stop and take a break. He can lift up to 8-10 [pounds] in one hand only. The claimant is

able to understand the environment as well as peers and communicate satisfactorily.  The claimant is able to travel independently.

(Tr. 260.)

On March 12, 2015, state agency physician James Cacchillo, D.O., reviewed Thompson's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 120-121.)  Dr. Cacchillo determined Thompson could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 120.)  He further found Thompson could never climb ladders, ropes, or scaffolds and would need to avoid all exposure to hazards.  (Tr. 120, 121.)

On July 7, 2015, state agency physician Teresita Cruz, M.D., reviewed Thompson's medical records and completed a Physical RFC Assessment.  (Tr. 132-134.)  She adopted the findings of Dr. Cacchillo.  (Tr. 133.)

**D.      Hearing Testimony**

During the August 31, 2016 hearing, Thompson testified to the following:

- He lives with his wife, daughter, and two grandchildren in a single story home. (Tr. 49-50.)  He attended school through the 12th grade.  (Tr. 50.)  He served in the military for several years as a combat engineer.  (Tr. 51.)  He has not driven in the past three years.  (*Id.*)

- He has not worked since 2010.  (Tr. 52.)  From 1984 to 2010, he worked for the same company, performing various jobs.  (Tr. 53.)  His last position with the company was a production scheduler.  (*Id.*)  He also worked as a production planner, mixer operator, and general supervisor for this company.  (Tr. 54.)  He stopped working due to layoffs within the company.  (Tr. 57.)

- He is unable to work due to his back problems and dizzy spells.  (Tr. 57.)  In 2006, he underwent a lumbar spine fusion after a motorcycle accident.  (Tr. 58, 59.)  He continues to have numbness and tingling down his legs.  (Tr. 58.)  He has undergone injections, physical therapy, water therapy, massage, and a TENS unit.  (Tr. 59.)

- He ambulates with a cane. (Tr. 76.) He does not attempt to walk without his cane, even at home. (Tr. 76-77.) He can stand about 10-15 minutes with his cane. (Tr. 77.) He is not able to lift a milk jug. (*Id.*) The cane was prescribed by a doctor after his 2006 accident, and he has been using it ever since. (Tr. 79.)

- He began to experience bouts of dizziness in 2006. (Tr. 62.) He missed work about 16 times a year due to dizzy spells. (Tr. 63.) His dizziness has worsened and he will shake and drop objects. (Tr. 64.) He has undergone testing and takes medications for his dizziness, but they are not helpful. (Tr. 65.)

- He has diabetes, with associated numbness and tingling in his feet. (Tr. 66.)

- He is depressed and forgetful. (Tr. 66.) He sees a psychiatrist and has been on antidepressants for the past three years. (Tr. 67-68.)

At the hearing, the ALJ adopted the findings of a prior ALJ, concluding Thompson had past relevant work as a production planner, mixer operator, and production scheduler. (Tr. 54, 80, 81.) The ALJ then posed the following hypothetical question to the VE:

> Okay. So – okay for the first hypothetical, Mr. Salkin, if you can please assume an individual of the claimant's age, education, work experience and also assume that this individual can perform the full range of light work and that this individual can never climb ladders, ropes and scaffolds, this individual must avoid all exposure to hazards such as unprotected heights and moving machinery. Okay, I'm just double checking. Also – I might also include that this individual is – should be precluded from work-related social interactions involving persuasion or selling.

(Tr. 83.)

The VE testified the hypothetical individual would not be able to perform Thompson's past work. (Tr. 83-84.) The VE testified Thompson had developed transferable skills in the performance of his past work, including scheduling, inventory, and requisition skills. (Tr. 84.) The VE explained a hypothetical individual with Thompson's transferrable skills would be able to perform other representative jobs in the economy, such as schedule clerk (D.O.T. #959.167-

12

010); inventory clerk (D.O.T. #219.387-030); and order clerk (D.O.T. #214.382-014). (Tr. 85-86.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Thompson was insured on his alleged disability onset date, October 21, 2014 and remained insured through December 31, 2015, his date last insured ("DLI.") (Tr. 12, 19.) Therefore, in order to be entitled to POD and DIB, Thompson must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2015.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 21, 2014 through his date last insured of December 31, 2015 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: history of fractured vertebrae and pelvis status-post lumbar fusion and laminectomy at L3-L5, degenerative disc disease of the cervical and lumbar spine, vasovagal syncope, and depressive disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could never climb ladders, ropes, or scaffolds. He had to avoid all exposure to hazards such as unprotected heights and moving machinery. The claimant is precluded from work-related social interactions involving persuasion or selling.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March **, 1960 and was 55 years old, which is defined as an individual of advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferrable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 21, 2014, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(g)).

(Tr. 12-19.)


## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

16

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        Residual Functional Capacity/Use of a Cane

Thompson argues the RFC is not supported by substantial evidence because the ALJ did not account for his reliance on a cane.  (Doc. No. 14 at 13.)  He asserts including a cane restriction in the RFC would "reduce [him] to sedentary activity and support[] a finding of

disability." (*Id.*) Thompson maintains the ALJ's conclusion a cane was not "medically necessary" is "premised upon selective portions of evidence and fails to consider the record as a whole." (*Id.* at 14.)

The Commissioner asserts "substantial evidence supports the ALJ's finding that Plaintiff did not require an ambulation aid." (Doc. No. 16 at 7.) The Commissioner argues while Thompson testified he needed a cane, he did not provide "any medical documentation describing the circumstances for which an ambulatory aid is needed." (*Id.* at 8.) The Commissioner contends the "evidence shows Plaintiff was capable of ambulating without a cane." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he

'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).

Relevant to this case, Social Security Ruling 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

Here, the ALJ determined Thompson had the following residual functional capacity:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could never climb ladders, ropes, or scaffolds. He had to avoid all exposure to hazards such as unprotected heights and moving machinery. The claimant is precluded from work-related social interactions involving persuasion or selling.

(Tr. 14.)

In the decision, the ALJ acknowledged Thompson's use of a cane and provided the following discussion:

> After October 2014, he continued taking Tramadol for chronic pain and generally used an assistive device for ambulation. However, the record does not show that a cane was medically necessary. Rather, most examination findings showed that he retained normal strength throughout (B1F/4; B2F/76; B3F/24; B6F/130). In August 2014, the claimant was able to ambulate several hundred to one thousand feet without sitting or using a cane and the record does not show that the claimant's back pain changed since (B4F/46).

(Tr. 15.) Later in the decision, the ALJ noted Thompson had a cane during the February 2015 consultative examination, but "ambulated without predisposition to falls." (*Id*.) The ALJ also observed Thompson "was able to ambulate without aids" during a July 2015 emergency room visit. (Tr. 16.)

The Court finds substantial evidence does not support the ALJ's failure to include any limitations to account for Thompson's cane in the RFC. A review of the record indicates Thompson's need for a cane was well-documented across multiple treatment providers. During an August 2014 driving assessment, Thompson used a cane and he indicated he also used a wheeled walker. (Tr. 536, 538.) While Thompson was able to ambulate "several hundred to thousand feet without sitting" this was done with the use of a cane. (Tr. 539.) Thompson also ambulated with a cane during October 2014 and April 2015 visits with his mental health providers. (Tr. 524, 325.)

During his February 2015 consultative examination with Dr. Saghafi, Thompson ambulated with an "antalgic gait without predisposition to falls" and used "a cane for safety." (Tr. 260.) Dr. Saghafi determined Thompson's abilities to stand and walk were extremely

20

limited, finding Thompson could only "walk/stand for about 20 minutes before having to stop and take a break."  (*Id.*)

In April 2015, Thompson's neurologist, Dr. Remahi, observed Thompson had mildly decreased sensation in both feet and was using a cane for ambulation.  (Tr. 340)  Several weeks later, Thompson was again ambulating with a cane during both an audiology balance evaluation and a pain management consultation.  (Tr. 445, 409.)  During the pain management consultation, he had a slow, antalgic gait.  (Tr. 409.)

Dr. Remahi again noted Thompson had decreased sensation in both feet and required a cane for ambulation in May 2015.  (Tr. 298.)  At that time, Thompson favored his left leg due to pain and had difficulty with heel and toe walking.  (*Id.*)  In October 2016, Thompson visited a different neurologist, Dr. Shields.  (Tr. 713.)  During this visit, Thompson reported weakness in his legs, tingling in his feet, and an unsteady gait.  (Tr. 714.)  He indicated he had been using a walker and a cane for the past 3-4 years to "prevent fall[s] from tremor spells."  (*Id.*)  Dr. Shields noted some mild gait abnormalities and increased tone in both legs.  (Tr. 715, 716.)  While Thompson could support his weight on his heels, he required balance assistance when taking steps on his heels.  (Tr. 716.)

In the decision, the ALJ notes two occasions in the medical record in which Thompson purportedly did not require a cane to ambulate.  The first example was the August 2014 driving assessment.  (Tr. 15, 536, 538.)  The ALJ asserted Thompson was able to "ambulate several hundred to one thousand feet without sitting or using a cane" during this assessment.  (Tr. 15.)  Similarly, the Commissioner points to this assessment as evidence Thompson "was capable of ambulating without a cane."  (Doc. No. 16 at 8, 2.)  This is a misreading of the evidence.  Indeed,

during this assessment, the evaluator specifically noted Thompson was using a cane to ambulate. (Tr. 538.)  The evaluator then observed Thompson could ambulate "several hundred to [a] thousand feet without sitting *using* cane."  (Tr. 539.)  Thus, the assessment indicated while Thompson could ambulate "several hundred to [a] thousand feet," he required a cane to do so.

Both the Commissioner and the ALJ also reference a July 2015 emergency room visit in which Thompson was ambulating without a cane.  (Tr. 16, 902, Doc. No. 16 at 8.)  However, both the Commissioner and the ALJ fail to mention Thompson presented to the emergency room in a wheelchair on this date.  (Tr. 901.)  Moreover, contrasting this one emergency room visit with the observations of multiple medical providers who documented antalgic gait, decreased sensation in the feet, and use of a cane, it is clear substantial evidence does not support the ALJ's conclusion.

The Commissioner argues Thompson "fails to cite to any medical documentation describing the circumstances for which an ambulatory aid is needed as required by SSR 96-9p." (Doc. No. 16 at 8.)  The Court disagrees.  There are several treatment notes contained within the record which describe the circumstances in which Thompson required a cane.  Indeed, Dr. Saghafi noted Thompson used "a cane for safety" and opined Thompson could only walk or stand for 20 minutes before requiring a break.  (Tr. 260.)  Dr. Shields observed Thompson used a walker or a cane in order to "prevent fall[s] from tremor spells."  (Tr. 714.)  Dr. Shields also noted Thompson required balance assistance when walking on his heels.  (Tr. 716.)

In sum, in light of the overwhelming documentation that Thompson consistently ambulated with a cane and the repeated objective findings of an antalgic gait and numbness in the feet, the Court finds the RFC articulated by the ALJ is not supported by substantial evidence.

This failure to account for Thompson's use of a cane in the RFC, in the face of all this objective evidence, is particularly unreasonable in light of the VE's testimony that the additional limitation of a cane would eliminate all the jobs the ALJ concluded Thompson could perform. (Tr. 88.) The Court therefore finds remand[4] necessary to afford the ALJ the opportunity to consider Thompson's use of a cane when formulating the RFC and obtain VE testimony to determine the effect such a limitation would have on the occupational base.

Finally, as this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Thompson's remaining[5] assignment of error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　 _s/Jonathan D. Greenberg_
　　　　　　　　　　　　　　　Jonathan D. Greenberg
　　　　　　　　　　　　　　　United States Magistrate Judge
Date: March 12, 2019

---

[4]    The Court acknowledges Thompson has requested this Court reverse the ALJ's decision and make a determination he is "entitled to a period of disability under the medical-vocational guidelines." (Doc. No. 14 at 15-16, 13.) The Court declines to make any conclusions regarding Thompson's disability status because the VE testified the addition of a cane in the RFC would "not necessarily" limit Thompson to sedentary work. (Tr. 88.) Thus, the Court finds remand, with additional VE testimony as to this point, is more appropriate.

[5]    Thompson's other assignment of error relates to the ALJ's evaluation of consultative examiner Dr. Saghafi's opinion. (Doc. No. 14 at 11-12.) As detailed above, the Court has concerns regarding the ALJ's RFC assessment and Thompson's need for a cane. On remand, the ALJ should carefully consider Thompson's need for an assistive device when evaluating Dr. Saghafi's opinion.